Court of Appeals in and for the 7th Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning, ladies and gentlemen. Good morning. Our first case is Local 1500 Welfare Fund against AbbVie. Mr. Sobel. Good morning, Your Honor, and thank you very much. I'm Tom Sobel, Hoggins-Berman Sobel Shapiro for the plaintiffs who are recent purchasers of the drug Humira. I believe that I've reserved seven minutes for a rebuttal. I can tell that by the nature of this panel I had planned a minute introduction, but frankly I'm going to skip over that and go right to the heart of the matter. There are essentially two claims before you on a 12 v. 6. One is abusive petitioning, and the second is a claim of an unlawful reverse payment. On the first of these, let me make something very clear. We plead and we intend to prove that there was widespread objective facelessness in the patent minefield erected by AbbVie. We believe that the complaint plausibly alleges that for many reasons. I've got eight of them, but I'm only going to address several. The first is this. Could I, excuse me, Mr. Sobel, just ask whether the purpose of what you just said about objective facelessness was a signal to us that you are not concerned about this matter that the parties debated about whether California motor transport and professional real estate investors do or do not have a different test? You're willing to say, as we did in futures, that objective facelessness is a factor? Yes, that's exactly why I'm addressing it that way, Your Honor, because we can, on the basis of the facts that we've pled, fully embrace and not in any way push back against futures exchange. Futures exchange does have some observations in it that are different than some other circuit courts. But what I'm suggesting quite clearly, I hope, is that regardless of that suggested difference, the facts here clearly show objective facelessness, what we plead and what we intend to prove. Thank you. So the first of these, of course, is that the complaint is replete with allegations that patents were invalid, unenforceable, non-infringed. I won't go into all of those things, but it is noteworthy this. AbbVie does not challenge the adequacy of our pleadings in that regard, either below or to this court. In other words, it has not challenged that we... It has not stated we inadequately proved that all of the minefield created by AbbVie was in some way deficient. The second reason is this. Let's look at AbbVie's conduct. When it settled the cases with biosimilars, it agreed to an entry date of 2023. The vast majority of the minefield had patents that expired well after that, meaning, from AbbVie's own point of view, that it did not have a good enough shot to be able to extend the patents any further. So let me again, just to nail this down, obviously we're on 12B6 review, so that gives a certain perspective on the facts. So I take it you're saying that a logical inference from the fact that AbbVie may have been giving up 11 years' worth of patent protection, some of those patents were not going to expire until 2034, and it allows 2023 entry, permits the inference that the patents were weak. Particularly when, yes, particularly when the yearly gross of the product exceeds $12 billion a year, one would think that it would be rationally in the interest of AbbVie to try to push out the agreed entry date much further. There are two charts, Your Honor, in our complaint. The first is at paragraph 91. At paragraph 91, we categorized the patents by type, and you'll see that at least the bottom two categories have patents that begin their expiry dates well after the agreed entry date. To the manufacturing and the other device diagnostics, et cetera. That's correct, Your Honor. So by AbbVie's own act of settling the cases prior to that, the implication is that they valued those at zero. The formulation patents, similarly, many of them expire well after 2023, and yet again they agreed to an earlier date. Finally, on the method of use patents, which do expire beforehand, Your Honor, we plead and I think will prove that BASF, which was the original developer of this product, obtained the original compound patent and did a remarkably effective job of covering the waterfront of particular uses in order to be able to block TNF-alpha.  The third, and I'll only do two more, the third reason, Your Honor, that it is plausible that we pled that this patent ticket was objectively baseless is that Abbott never went to trial on a single claim on a single patent. It did not even go to summary judgment on a single claim or a single patent. It did not even proceed to a Markman hearing. In other words, when push came to shove and they were going to have to defend these patents, it never moved forward to a hearing, excuse me, to a dispositive ruling or a material ruling of any kind. And also, it did not even, it settled many of the cases against, I think, five or six of the biosimilars without the need of those biosimilars to even go to litigation. So for those reasons, as well as, obviously, because we plead it, the number of patents, the pace of their acquiring them, the timing of when they acquired them, you know, a dozen years after patent, excuse me, product launch, those facts also be able to show objective baselessness. Can I ask you this question, Mr. Sobel? This is something that's been bothering me as I've read both the district court's opinion and the briefs. The district court and your opponents both accept, I'll take them collectively, accept the proposition that if somewhere in this group of whatever it was, 132-some-odd patents, if there was even one valid patent that you lose on this point, and I would like you to address that aspect of the argument. Sure. So first, we know that there wasn't a silver bullet because if there was a silver bullet, the biosimilars would not be coming to market well before the expiration of many of these patents. So there was no silver bullet. We also know there's no silver bullet because Abby hasn't pointed one out. There also isn't that either. We also know that on this 12B-6, that we have challenged the patents, and therefore there's no presumption of patent validity. We also know from the Supreme Court... Excuse me, I'm getting lost. Why is there no presumption that these patents are valid? They were issued. Some of them have even withstood inter partes review. Why would there be no presumption of validity? So there's no presumption of validity in this sense. It starts with a presumption of validity. It puts the burden on the plaintiffs to challenge the patents. In this situation, we've done it. And to prove the challenge, not simply to file a complaint, it's not a bursting bubble presumption. No, not at all. So that brings me back to Judge Wood's question. Are you proposing to prove in this litigation, not allege, but prove, that all 130-odd patents are invalid, every single one of them? Right. What we are going to prove is that there are two theories of causation. The first causation theory... I don't think Judge Wood or I are asking about theories. It's a concrete question. Are you proposing to prove that every single one of the patents is invalid? Well, and let me just add, at least for my part of that question, and if not, under what legal theory do you proceed that it might not be necessary to prove that every single one of them is invalid? Right, which was where I was going. Where I was going. So, yes, Judge Easterbrook, we intend to prove that, more likely than not, one or more of the biosimilars would have prevailed against all assertions being made against them in a manner such that they would have been able to get to market prior to 2023. Well, can I just add, I take it that not every patent in this package of 130-some-odd was being asserted against every biosimilar, that certain packages were asserted against one and some packages were asserted against others. Is that correct? That's correct. So there were anywhere in the range of the low 60s to the low 80s of patents that were in the patent dance against the biosimilars. Those are the patents... So it wouldn't matter, just to tie this up, if 80 patents were asserted or 60 patents were asserted against you, it wouldn't matter if a patent outside that group of 60 patents happened to be valid because AbbVie wasn't relying on it. It wouldn't matter if it was outside that, number one. Number two, it wouldn't matter if that patent expired before 2023 because it wouldn't block it, so we don't have to prove that that patent would have been... you know, they would have won on that patent. And on the balance of the theory that we do intend to prove that one or more of the biosimilars would have won, yes, on the balance of those patents, we're going to say it's more probable than not that they would have prevailed on some basis. The alternative theory where we don't have to prove to the jury that the biosimilars would have won every single patent is the alternative settlement approach, i.e. on that view, absent a payment or absent the bogging down of the system by all of these patent assertions, the biosimilars would have been on a markedly different platform in order to be able to do the negotiation on what the agreed entry date would have been, and therefore, given the probabilistic nature of all of these patents, because they had not gone to final litigation, that there would have been an earlier agreed entry date. So it's on that... Can I... I'm going to mix apples and oranges here for a minute, but the same could have been said of the patents in the Octavius case. I mean, some of them were asserted, and yet the Supreme Court writes, but we don't know at the end of the day if they would have survived infringement charges or invalidity charges or other sorts of things you would say about a patent. Yes. So the teaching, fundamental in my view, the fundamental teaching in Octavius is that patents are probabilistic. In other words, you don't know until you've actually gotten to the end of a final judgment whether the patent is or is not valid, whether it's infringed or whether it's not infringed. And given that probabilistic nature, if you will, the negotiation between the parties ought not be influenced by some external reverse payment, but should instead be based upon the merits of the patent. Counsel, that's one of the things that worries me about this case. The validity of patents in litigation is probabilistic. But let's suppose that there is a 90% chance that each of the asserted patents, each of the issued patents, is invalid. If you multiply... If you take 0.9 to the 132nd power to get the probability that all of them are invalid, that number is astoundingly small. So if one is making a probabilistic judgment, the probability that all 130-plus are invalid, despite each having been issued by the patent office, is pretty small. Doesn't that reflect somewhat on what's going on here? Well, I'll agree with you that if you add up the need to be able to prove on an additive function all of that probability... No, it's multiplicative, it's exponential. You contend that there are not, in fact, 130-some-odd distinct patents, but that there are 20 groups. So suppose you do this exercise by group on the assumption that the groups are dependent within them but independent across groups. It is then something like 0.9 to the 20th power, which is also pretty small. Under the assumption that each of those groups is separately meritorious. And I think that what we've alleged and what we'll prove is that when you look at the groupings of these patents, you actually end up with not as many groups as one would think. You contend that there are 20. I'm just taking your own number. You say there are 20 groups. I was just taking your brief at what it said. Yes, there are 20 groups. The question then, though, is are they independently, as groups, valid? And we suggest not. And I do think that we also plead and have shown... Just to clear this up again, I mean, I think this could prove to be important. One way of looking at this is to look at all 132 patents. Another way, though, is biosimilar to biosimilar so that there could be patents out there that are completely irrelevant to biosimilar company number one but may be relevant to biosimilar company number two. And I would imagine your complaint would go forward if even some of them were being kept out of the market. Yes, exactly. It is biosimilar to biosimilar in terms of who would have been able to get to the market earlier if they were able to win the patent assertions or they were able to negotiate an earlier entry date. Going back to Judge Easterbrook's question, what I would suggest, Your Honour, is that if we look at the empirical studies that we cite in our brief, there is empirical evidence that biotech patents lose validity challenges four out of five times. Which implies that my number is too small. It should be 0.8 to the 20th power. That's an even smaller number. But that's also before we look at the particular facts of this case. So one is looking at those studies as a whole on biotechs generally, but then if we look at the rhythm at which AbbVie was trying to line up its patents in these groups, its chances, I think, plausibly, go down significantly lower. And I also think that, again, going to the notion that what we're talking about is not only an approach to having to prove each of the patents, more likely than not a win, but also given the probabilistic nature of this, that they would have been able to negotiate an earlier entry date. And, again, I also think that if you look at AbbVie's actions, it does not have the silver bullet or even the probable probability of a silver bullet of anything that's going to go beyond 2023. On a 12B6, I think that our allegation should be therefore accepted. I now want to turn to the reverse payment, if I may, for a moment. At the time that the complaint was filed, there were four approved biosimilars, yet none were on the United States market, but there was already robust entry in Europe. At this time, there had been two more biosimilars for Humira approved, and yet, again, none is available in the United States and won't be for another two years. And yet, in Europe, they've now had vibrant entry. There's a stark contrast in the settlement that happened in Europe and the United States. In Europe, AbbVie gave the biosimilars entry on the exact date that the compound patent expired. That's the 2016 date, in other words. The 2016 date. The European compound patent expires in 2016. The United States compound patent, the 3A2, expires in 2018. And yet, United States biosimilars do not enter for five years after that until 2023. So could you talk for a minute about the argument that, again, is made in the briefs, and some of the amicus pick it up, some don't on other sides. It's that one sentence in Actavis that says, early entry, if all you're doing is early entry, then you can do that because a patent owner can waive the whatever degree of exclusivity that person has. And then there's this discussion about the value that AbbVie was allegedly giving away in order to make this something that looked more like a reverse payment agreement, pay to stay out, as opposed to just volunteer to stay out. And there's this side discussion about whether it all has to be cash payments or whether it could be other forms of value. So if you could delve into that a bit, I would appreciate it. Sure. So the sentence you're talking about says, the court has no problem with early entry license. That makes sense. And then it says, so long as there is not a reverse payment. And it's the so long as the reverse payment, which is, of course, in our view, the key issue. And again, I go back to the way that I received the teaching of Actavis. It is this. Given the probabilistic nature of patents, the brand's position is going to be that the biosimilar should wait until the absolute expiry of the last expiring patent. The biosimilar's position is, they're all malarkey. I should be able to enter today. And they should negotiate something in between, simplistically speaking. When, however, you introduce into that negotiation the brand side paying to the rival, here are the potential biosimilar, some kind of consideration, that's then disturbing the balance and injecting into it an influence on the biosimilar to settle the case and avoid the brand's risk of loss. That, to me, is that teaching. And so how we see that. Do you want to speak, Your Honor? I was just going to say, the more precise you can be about how you figure out what the value was, in this case, at least as you read the allegations of your complaint, which I have here, that would be great. So the value of the payment is looked at both from the cost to the brand and to the value to the biosimilar. It has two perspectives. The cost to AbbVie would be whatever ability it had to keep the generics out of the market, the biosimilars out of the market longer in Europe, and to be able to receive funds. And we value that in the complaint at hundreds of millions of dollars. From the point of view of the biosimilar, each of the biosimilars gets the value they get by entering into the market earlier than they might otherwise be able to, and assess the value that way. It will require, as we've done in many other reverse payment cases, the proof at points requires estimates of the probabilities of loss or gain, which is what we do. And that's how I would answer that question, Your Honor. OK. That's fine. The final point I want to make on the reverse payment is this. The reason that it is plausible that there is a trade-off that is going on here is not simply because the agreement happened at the same time and that there is, obviously, a global deal admittedly going on. But it is this counterpart to the fact that in Europe, what AbbVie did was essentially value at zero the remaining patent life it had on its compounds, excuse me, on its patents in Europe. We plead in the complaint that AbbVie has spent an enormous amount of time and energy in Europe trying to extend patent life beyond the compound patent in Europe. And yet, when it sits down to settle with each of the biosimilars or the three biosimilars who are defendants in this case, it essentially gives no weight, no value whatsoever to that remaining patent life. And that's how we believe that it's plausible that there's value, to use the hackneyed expression, a sweetheart feel, if you will, on the European side. And in exchange, in the United States, there's a five-year wait after patent expiry of the compound patent for biosimilars to enter. And I don't think, despite everything that the defendants have done by effectively presenting in their briefs, their position essentially is that there is a complete immunity to engage in this cross-country trade-offs. And we think that as a matter of law, you can't endorse the notion that there's  And I don't see that. I've run out of my time, except for my seven minutes of time that I've reserved. So unless there's a question you have right now, I'll yield. Certainly, counsel. Mr. Hurst. Jim Hurst, representing AbbVie. My colleague, Mr. Toto, will spend our last seven minutes focusing on antitrust injury, section one. I just want to start with the section one claim. The settlement here were exactly the kind of commonplace settlements that the Supreme Court blessed in activists, early entry deals that open up competition before patent expiration. And particularly under Twombly. Can I ask you, Mr. Hurst, before you get too wound up into this, why isn't this just the discredited scope of the patent argument that the court actually rejected in Actavis? There is that qualifier in the sentence. And if, for example, the value for getting into Europe were 100 times as much as projected litigation costs and other sorts of things, why hasn't AbbVie given away something valuable for this market division that you've created? Well, the scope of the patent test is different because it says even if there is a reverse payment, as long as it's within the scope of the patent antitrust immunity. Why doesn't this look exactly like that? Unless you are really wanting to insist that the only kind of payment that counts is cash on the barrel head, which seems to me in today's world close to absurd. I don't know why we can't evaluate exchanges of value. No. We're not taking the position that it has to be cash. But our position is that it can't just be opening up competition. That's a completely different kind of animal. Actavis definitely drew a distinction between cash or cash in kind versus early entry deals, which are just opening up competition. That's a completely different animal. As the FTC said in its brief, absent a reverse payment, the settlement's entry date presumably reflects the party's approximation of the expected level of competition that would have obtained had the parties litigated. So that's what an early entry deal is. It's opening up competition based on an analysis of the patent situation. Why don't you have to evaluate? I mean, for example, so AbbVie gives up a certain amount of value in Europe. It obtains a certain amount of value, five years of monopoly, further monopoly on Humira in the United States. And then it gives up 11 years of monopoly in the United States also. These are things that can be quantified. Any decent economist could do that. But if you dig down in the allegations here, Your Honor, in Europe, entry in 2018 was unavoidable. Unavoidable for two reasons. So we didn't give up anything in Europe. Actually, we got things. We got royalties. So in Europe, if you just look at the plaintiff's allegations, the appellate's allegations in their complaint, they said we had an exceedingly weak patent position in the EU with only two narrow patents as compared to what they called an impassable 130 patent fortress in the United States. So naturally, the date for entry in the EU will be earlier. But more importantly, Your Honor, whether we did a deal or not, the biosimilars were going to be launching in 2018 in Europe. Why? So we're supposed to think they're just stupid then, right? I mean, because you said you're going to go in anyway in Europe in 2018. And in exchange, you'll tie your hands in the United States for an extra five years? Is that what they did? No, my point is this. The plaintiff's theory is that we gave away something in Europe in exchange, early date in Europe, in exchange for a later date in the United States. But actually, in Europe, and here's why, there was going to be a 2018 launch because there was only two patents that still existed. And those two patents covered three of six approved indications. I'm sorry, three of nine approved indications. So what that means is- Are you looking at paragraph 140? I mean, there were 72 patent applications with the European Patent Office for this active ingredient, which I can barely pronounce, Adalimumab, Adalimumab, mob. Anyway, a lot of patents, two in force today. And then there are other allegations about the European market, which, of course, operates a bit differently from the US market. Patents are national. Your Honor, in paragraph 191 of the complaint, they said there was only two remaining patents in Europe. Those two patents covered only three of nine approved indications. What that means is that for six approved indications in Europe, there would be biosimilar launches. And for the other three indications that were patented, Your Honor, AbbVie got royalties. We didn't give them away for nothing. We got substantial royalties in the three patent indications that lasted for years and years. If you look at the Amgen Agreement, which is in the record docket, District Court docket, 126-2 at pages 9 and 10, it shows that for the three patented indications, we were getting substantial royalties for years and years. So are these royalties on expired patents in violation of Kimball against Marcell Entertainment? No, Your Honor. We did in Europe have patents that continued on three of the nine approved indications, according to the plaintiff's allegations that we had two patents. So you were going to get royalties on them? We were going to get royalties on the three patented indications that were covered by the two patents that the biosimilars have alleged... I'm sorry, that the plaintiffs have alleged still existed in Europe. So that was the deal. And it wasn't we were giving anything away. We were literally getting royalties in Europe. Look, under Twombly, Your Honor, you shouldn't be allowed to launch an enormously expensive antitrust action based solely on different entry dates in different jurisdictions with different patent laws with drastically different patent positions. Well, look, let's not overdo it on Twombly. Twombly requires specific notice of things, and this is a very detailed complaint. I mean, you're just arguing as a matter of law, have they put on the table enough for the reverse payments theory to survive? And that depends on one's interpretation of Actavis. There's no Twombly problem here, per se. But they have to have a story that holds together. And here, when the 2018 launch in Europe was automatic, it was going to happen for six unpatented indications. Do we have to accept the facts in your light, though? I mean, I'm bothered by the fact that this is 12B6. I can't... I don't doubt at all that somebody could look at the facts the way you're describing them. But it has to be necessary. I'm accepting the plaintiff's... the appellant's allegations in their complaint. At paragraph 191, they said they have... we had only two patents, and those two patents cover only three of the nine approved indications. The Amgen Agreement is also in the record. They cited it throughout their complaint. In the Amgen Agreement, it shows that we got royalties for those three patented indications. But more... maybe critically important here, Your Honour, this notion that the only reason the biosimilars agreed to a late 2023 date is because they got a 2018 entry date in Europe is absolutely inconsistent with the pleadings... the complainant's complaint where they acknowledge that the only thing that Mylan and Borenger got was the United States deal. No EU licensing deal. So you have a situation where you have two highly sophisticated biosimilars, Mylan and Borenger, where they have every incentive in the world to try to get as early a date as they can possibly get in the United States, accepting the 2023 date, without getting the alleged reverse payment of this EU licensing deal. And, look, under the law, you shouldn't be construing complaints in ways that are inconsistent with the pleadings, but that's what plaintiffs are asking you to do. They're acknowledging... I'm not sure about that. What do you have to say about paragraph 192, where they say rather than take the risk of an adverse judicial verdict, AbbVie decided to abandon those patents, that is to say the 656 and the 322 in the UK, and take other measures, so kind of control the effect of what was going on in the UK. I mean, I just don't know that it's as simple as you're portraying it to be, I guess I'll just say. Your Honor, the allegations about what happened in the UK actually hurt the plaintiffs, the appellants here, because what they're saying is we didn't have any patents left in the UK. We abandoned our patents in the UK. That's a major market. So there was going to be full-blown competition in the UK. What they said is that elsewhere we have two patents that remained in existence, and those two patents were narrow, covering only three of nine approved indications in the EU. And just to get back to Activist, Your Honor, it was dealing with an entirely different scenario for two reasons. First, under the Hatch-Waxman Act, and that's what it was dealing with, there's first filer exclusivity, there's a 30-month stay of FDA approval, and that creates the opportunity where you can do a deal with the first filer in a way that blocks all the other generics. But what do you say about the fact that in Activist, just as in your situation, the deal allowed earlier entry, 65 months, as I recall, was the length of time, and certainly the argument was strenuously urged in Activist that this could be nothing but pro-competitive, to let somebody in 65 months earlier, and yet, that's not what the Supreme Court made of it. Look, I'm not quibbling with the fact that if there is, in fact, a reverse payment, even an early entry deal can run afoul of Activist. I'm not quibbling with that. What I'm saying here is that there's no plausible allegation that there was a reverse payment here. I mean, just focusing on the fact that both Mylan and Borenger accepted the 2023 date without the alleged reverse payment. But the BPCIA is completely different from the Hatch-Waxman Act, Your Honor, and I think this is an important point. When you do a deal with one party... I don't think the FTC or the Department of Justice are 100% on board. There are certainly some differences between Hatch-Waxman and the regime that governs biologics, no doubt, but there are many similarities, too. But this is an important difference that is important for the context that we're in right now. When you do a deal with one biosimilar, it has zero impact on the other biosimilars. They can make their own independent judgments about whether to litigate at the end, launch at risk, or settle. And here, nine biosimilars all agreed independently to the 2023 U.S. entry date. Two of them, Mylan and Borenger, did so without getting the reverse payment, and that's in the plaintiff's complaint. They do not allege that either Mylan or Borenger got a reverse payment, and yet they got the same 2023 date. There's another point, too, that this plaintiff's... appellant's theory is in tension with the reasoning in activists, which is the following. Part of the justification for the majority's activist decision is that you wouldn't need to do an in-depth patent analysis because, the theory went, that the payment itself would serve as a proxy for the strength of the patent. The higher the payment, the weaker the patent, so the theory went. But here, under the plaintiff's theory, what they're asking you to do is allow the case to go forward where a jury may someday have to decide, based on foreign patents, based on foreign laws, whether or not the deal in Europe was perfectly calibrated, whether the date was right, whether the royalty levels were correct. So this is a pretty dramatic extension of activists and one that runs squarely into the reasoning of the Supreme Court. Look, under the plaintiff's theory, allowing them to get to court based on differing entry dates in jurisdictions inside and outside the United States, it would wreak havoc on global fairness. I mean, that's a descriptive thing, but I think the theory is simply, you've got to look at each agreement. This is what I understand the FTC to be arguing. You've got to look at each agreement and figure out whether there is value being transferred that could be called a reverse payment. If the answer is no, then you're inside the safe harbor of activists. If the answer is yes, then you're not. And there's more to the case. It doesn't mean that there isn't... I mean, there are obviously other theories or other aspects of the case that would still need to be looked at, including the one your colleague is going to talk about, but it's not quite as simple as you put it. It's not just sort of totting up dates. But the appellants haven't even grappled with it below. They talk in really conclusory ways about there must have been a payment in Europe without grappling with the fact that 2018 launching was an automatic thing, whether the fact that we got royalties in exchange for the patented three indications out of the nine. They don't even grapple with any of it. So why did AbbVie give up, then, 11 years' worth of exclusivity for this money machine called Humira? The 2023 date... Look, from a corporation... Why isn't that a signal of tremendous weakness of these extension patents? Not at all, Your Honour, because, first of all... But, first of all, just certainty for a corporation and their investors is highly valuable, number one. No, no, Your Honour. As you go farther out in time, the patents get narrower and narrower. So the later the patent, the more likely it's going to be narrow. So we had patents that were really broad, going maybe out to 2027, 2028, that we figured the biosimilars would run into, and we were compromising to 2023. That is a perfectly appropriate compromise. And, again, look at Mylan and Borenger. They agreed. So, look, in the end, if you're going to say that... Well, because the transaction costs of litigation, for them, too... You're not the only ones who can raise the specter of very expensive litigation. Maybe they just figured, well, these other guys have 2023. AbbVie has signaled that they're going to fight to the death for 2023, so it's cheaper for us to just go along. Well, look, if you believe the allegations from the plaintiffs below, it would have been enormously lucrative for both Mylan and Borenger to get in the market earlier if they could. Enormously lucrative. And it would have paled to litigation costs. And yet they didn't do it. They accepted 2023. Look, if the result here is that all you need to do is have different dates in different jurisdictions, you're literally telling the pharmaceutical industry they can't do global settlements because different dates, you can launch an antitrust action, and the law should require more than that. Let me turn to Section 2, if I can. Plaintiffs are relying on the sham patent exception, which, in U.S. futures, this court called extraordinarily narrow. One key point I want to make here is that the argument below from the appellants was exclusively California Motors. They literally said affirmatively... We're going to worry, I think, at this court about what we think professional real estate investors has to say and so on. So I don't want you to waste your time too much with that. What I will say is... No, I guess my point was waiver, Your Honor. Oh, no, there's no waiver of a legal theory at 12B. You don't even have to plead legal theories. But what I was going to say is when you look at your... Taking the facts in the light most favorable to the plaintiff's allegations, it's what I call a needle in a haystack theory, that if you throw enough spaghetti on the wall, somebody might discover that there's one strand that's organic soy and so really good, even if all of the rest of it is just plain old Durham wheat and no good. And it costs a lot of money to sort through to find this one little gem in there. And I think that's part of their theory that reminds me actually of the classic antitrust theories of predatory acquisitions, which has been part of Section 2 law at least since the Standard Oil case, so a long time. And I apologize, Your Honor, but it's... So your theory of the... Their theory of the baseless behavior that Abvie was going into is what I'm calling this needle in a haystack theory. And they also, I think, as I understand from Mr. Sobel, are arguing that company by company, it wasn't everything, that there were patents that were expired, there were patents for ingredients that didn't even play into the manufacture of something, that there was all sorts of reason to find both objective baselessness and the requisite subjective intent. Your Honor, they're only alleging that there was only three lawsuits. So they're only alleging three sham lawsuits, now on appeal under PRE, even though they literally said to the district court, we do not assert a claim under PRE, but they're alleging PRE. And these three lawsuits were filed after the biosimilars initiated the dispute, after the biosimilars agreed that a litigation was necessary to resolve at least one patent dispute. And two of the lawsuits involved IPR battle-tested patents. Your Honor, patents obviously are presumptively valid. Here, biosimilars used the IPR proceeding to try to take down our patents. Nine, they didn't get past the first step. Could you please use real English words? I think what you mean, or maybe I should say use real Latin words. I think you're referring to the inter partes review, but the jargon that... My apologies, Your Honor. ...is not what we judges use, and it would help us. The inter partes review. It's a patent office proceeding where the first step is an exceedingly low bar. All the biosimilars had to show is that they were reasonably likely to prevail on just one claim in the patent to move forward. On a limited record, on a limited record, of course. Your Honor, it was the entire anticipation or obviousness defense. These are the two main defenses to try to validate a patent. So it was not a limited record. In fact, there was 250 pages of reasoning from the patent office affirming that they couldn't even get past step one for nine patents, for nine patents. That just shows the... That is the kinds of... That's the legitimacy of our patent portfolio. And also, the biosimilars, they weren't required to suggest that we litigate even one patent. Amgen said we should litigate six per side. Sandoz, one per side. And Boringer, five per side. And what they said is under the statute, they believe those patents should be the subject of an action for patent infringement. How can it be a sham lawsuit when your opponent invites the litigation because they want pre-launch certainty? They want to make sure that they get a ruling on these patents before they launch, so they don't want to launch at risk. That shows the value of the patents. And additionally, Amgen, both Amgen and also Boringer, Sandoz, stayed out of the market, even though they got FDA approval. For over a year, each of those parties stayed off the market because they were respecting our patent portfolio. They did not launch at risk. To say that under these circumstances, the plaintiffs have adequately alleged that we don't even have colorable patent claims for these lawsuits, that our lawsuits were objectively baseless, there's just nothing to it. All they do in their complaint is allege garden-variety patent defenses with no elaboration or detail. That cannot possibly be enough, or otherwise every patent lawsuit would be objectively baseless because in every patent lawsuit, defendants raise defenses. That just can't possibly be enough. And down below, they absolutely made it crystal clear they were not challenging all of our patents. They said many, many, the majority, and really conclusory, just formulaic patent defenses to most of the patents. So in these circumstances, particularly where Amgen and Sandoz stayed off the market in the face of our lawsuits and didn't launch at risk, this is not a situation where the plaintiffs have somehow wedged themselves into the extraordinarily narrow sham patent exception to Noah Pennington. I see that my time is up, so I'll turn it over to Mr. Toto. Thank you, Mr. Hurst. Mr. Toto. Thank you, Your Honor. Good morning, I'm Martin Toto representing Samsung BioEpis. Samsung, along with Amgen and Sandoz, are the biosimilar defendants here. And we face only the Section 1 reverse payment allegations. And as Mr. Hurst said, I'd like to focus my time explaining why plaintiffs have failed to allege causation or injury in fact with respect to the Section 1 claim. And that's an independent basis, as the court knows, to affirm the Section 1 dismissal below. The biosimilars are the companies that face the Umaira patent estate here and trying to get their products to market. The complaint describes that estate as an impassable patent thicket. Plaintiffs argue that the Umaira patents would frustrate all would-be competitors, create a roadblock to entry, and prevent biosimilar entry. Those are all plaintiffs' words. Yet at the same time, there's a one-sentence conclusory allegation that absent the illegal conduct, competition would have occurred as early as 2016. Now, in looking at causation and creating a but-for world, you remove only the alleged wrongful conduct. And I think this point has maybe gotten confused in the briefs. But for the Section 1 reverse payment claim, what that means is all you remove is the settlement agreements that contain the European entry day components which plaintiffs allege is the payment tier. Everything else stays the same in the but-for world. So the issue is, if you remove those settlements, would the biosimilars have gotten through the impassable thicket? And also, would they have done so  And while the court must draw reasonable inferences here in plaintiffs' favor, those inferences cannot be inconsistent with the alleged impassable thicket here. Now, both of plaintiffs' theory- Without the thicket, of course, the biosimilars wouldn't have had to even talk to AbbVie. They could have waited patiently until the patent expired in 2016. And if AbbVie hadn't engaged in the creation of the thicket, they would have entered or not, as they chose to from a business standpoint. Well, that's true. But for the section one claims, the thicket still exists in the but-for world, right? You just remove the settlements that took place. You remove the European component of that and you ask what would have happened. We still had to find our way through the thicket, either through an alternative settlement or through a litigation win, both of which I'll talk about now are highly implausible based on the existence of that thicket. So turning to both those theories- So you're not arguing unclean hands, are you? I am not arguing unclean hands. Plaintiffs have suggested in their briefs, it wasn't mentioned in the complaint, but plaintiffs have suggested that unclean hands is somehow a silver bullet that could have invalidated all of AbbVie's patents. Even though my client never even got to the patent dance, let alone to the point of asserting a defense like unclean hands. So we are not arguing unclean hands. Okay. Now, we heard some of this already. Plaintiffs don't dispute. It's talking about the successful patent challenge theory. Plaintiffs don't dispute in their briefs that it only takes one valid infringed patent to block entry. And maybe as Judge Wood was pointing out, maybe that's only the 60 or 80 patents that were alleged, but it's still a large number of patents where you would only have to find one valid infringed patent to block entry. So that allegation alone makes the litigation win highly implausible. But there's a second reason, and that's just the sheer amount of time and cost, as Judge Wood pointed out earlier, that it would take for a successful patent challenge to take, to be completed. Now, plaintiffs in their briefs talk about, and this wasn't in their complaint either, they talk about a four-year timeframe for the litigation, three years to trial plus one year for appeal. But that's only the first phase of the patent litigation, which involves only a handful of patents. It says nothing about the second phase of the litigation, which would have involved scores of additional patents here. And it's clear from the complaint that- Why would you start with your weak ones? Wouldn't you start in that first stage with the strong patents and then have left over the weak ones? In other words, I'm not sure I'm buying that there's a parity of time that needs to be assumed or a parity of difficulty. Well, it's still going to take a lot of time to parse your way through 60 or 80 additional patents. And my client, for example, hadn't even started the patent dance when they settled. They were another half year away even from the first phase. Then you add another four years, and plaintiffs would have you believe then that the second phase was done in about a year. That's the only way the timing works. It's hard to imagine, even if that's a weaker set of patents, that's all going to get wrapped up in a nice neat bow in that short of a timeframe. The timeframe, as the district court recognized, simply doesn't work. The clock runs out at a certain amount of time. I see I'm running low on time, so I want to briefly talk about the alternative settlement theory, which is their second theory of but for entry. All of the facts that make a litigation win implausible mean that the biosimilars here had no leverage to negotiate for an earlier date. And as Mr. Hurst pointed out, we don't really even have to speculate on what an alternative settlement looks like here because we have one in the record. We know that Beringer and Milan settled for U.S.-only dates. They got no European entry dates. That's the alternative settlement here. That removes the quote-unquote payment, the European component. And what did they get? They got very similar 2023 entry dates, in fact, later dates than my client. I see my time is up. Thank you very much. Thank you, Mr. Toto. Anything further, Mr. Sobel? Yes, thank you very much, Your Honor. First, on the inter partes review that Mr. Hurst had mentioned and Your Honor asked a question about, I think it's important to be mindful about this. Of the 13 inter partes review proceedings, which involved nine patents, it's important to observe that seven of the nine patents expired before 2023. Mr. Sobel, I'd like to ask you a question on the Section 2 claims that might help me. When you talk about widespread objective basis, you said there were eight arguments, and usually you argue your strongest point first. Your third argument was that Abbey never went to trial or prevailed in summary judgment. That's the test that you've set out, I guess, for objective baselessness as your third point. But no biosimilars ever launched early anywhere. What are we supposed to make of that? If you're saying we should look at the fact that there were no trials, they didn't test these at trials, or pursue them in summary judgment, what do we make of the fact that no biosimilars launched early when they could have? What we make from it is that Abbey's scheme worked, Your Honor, is what I would suggest. It was incredibly problematic for any company to take on even a minuscule risk. Even if it was objectively baseless, totally objectively baseless, that you're saying they wouldn't have launched early? Yes. Even if there is a very small risk of loss, one that one would measure, Your Honor, as something being completely not probable cause. But nevertheless, if you're staring at being the first biosimilar to enter into a market that has sales of over $12 billion a year, you're going to run the course. You're not going to take that risk. That's what I would suggest, Your Honor. And what is that contention based on? We see an awful lot of patent litigation after somebody has entered a market. Your view seems to be that everybody is so risk averse that no one takes the risk of patent suits. No. I think it's quite often that people take the risk of patent suits. And I think that over time, depending upon what company it is and what market it was. They take the risk because they hope to make a gain in profit in the market by winning the litigation. Sure. So are pharmaceutical companies, presumably their shareholders, extraordinarily risk averse compared to other companies' shareholders? Well, I don't think that they are one way or the other, whether they're more or they're less. And even in this situation, what I would suggest, however, is that one thing that all companies do do, regardless of whether they're biosimilars or small molecule generic companies, is they look at the size of the market and the potential exposure that they will suffer. And I think that in that situation, with this being the largest selling drug in the United States by magnitudes, or not magnitudes, but by far, I exaggerated there, it is going to be extraordinarily unlikely that any company is going to take that risk. So you're essentially saying probability times risk of loss is going to result in a number that, for each of these biosimilar companies, is like their net worth or something. They're not going to do it. It's going to exceed their profit line. Yeah. And we also need to understand this market is somewhat unlike other, like, again, the small molecule market. In the biosimilar area, the biosimilar companies are also in the position of being the biologics at times, right? And so it is a different kind of animal, if you will, where you've got biosimilar companies that are also in the position of being biologic companies. I don't know which way that cuts, but I do know that it sets this marketplace, if you will, very differently than the very traditional area of traditional brand companies against, you know, pure brand companies against pure generic companies. Mr. Sobel, is it... Let me ask you a question about Section 1 here. Is it the plaintiff's position that a brand can never settle litigation in the United States and litigation in Europe at the same time without subjecting themselves to lawsuit in the United States? No, absolutely not. So how could they do it consistent with activists and not subject themselves to a lawsuit? If a company decides that it wants to combine settlements, you know, from one market and another market, the company needs to make sure that it's settling and not trading off one against the other. Here, in this particular circumstance, we have plausibly proved that it's not competition on both sides, but rather it's a sweetheart deal in Europe and it's a terrible deal for Americans. But if that was the test at the pleading stage, couldn't you always pass that test? Couldn't you always plead that and argue that it was plausible? And I know how they could win at summary judgment, but couldn't you always get past the 12b-6 motion? Again, I understand why you're pressing me on it, Your Honor, and I want to turn to that in a second, but let me just say, the answer, I think, is no. Because a straightforward pleading needs to prove that it's sweetheart on one side and a detriment on the other side. If you can't plead that, then you can't go forward. Well, you said prove. It doesn't need to prove. You just need to state that it's plausible. Yes. If I said prove, I misspoke, Your Honor, because I did intend to state that you have to plead and then eventually prove that it is a sweetheart deal on one and it's bad on the other. And what I would also suggest, Your Honor, is that one needs to ask oneself this question about global settlements, particularly when you're dealing with a settlement in Europe and a settlement in the United States. Why are they together? And I suggest that a big reason may be the reason that they're together is because there is some kind of tradeoff that's going on. Well, either that or they were sued in both jurisdictions. Well, but they were separately sued and they could have separately settled. My final, well, actually, I'm out of time, so I'm going to keep my final remark to myself. Thank you very much. Thank you very much, counsel. The case is taken under advisement.